## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

  vs.

STEVEN J. JACOBSON, ADVISOR
RESOURCE COUNCIL, f/k/a 360
WEALTH MANAGEMENT LLC
("ARC"),

    Defendants,

MARIAN JACOBSON,

    Relief Defendant.

Case No. 2:23-cv-05650

JUDGE

MAGISTRATE JUDGE

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY OF THE ACTION

1. This matter arises from a cherry-picking scheme perpetrated by
Steven J. Jacobson ("Jacobson"), a Louisiana-based investment adviser
representative ("IAR"), and disclosure, compliance, and recordkeeping failures by
his former firm, registered investment adviser Advisor Resource Council ("ARC").
From July 31, 2020 to October 1, 2020, Jacobson disproportionately allocated
option trades with positive returns between the time of the trade and the time of
allocation ("first-day returns") to his personal account, to an account in name of his
mother, Marian Jacobson ("Marian"), and three other favored client accounts
(collectively, the "Favored Accounts"), while disproportionately allocating option

COMPLAINT         1

trades with negative first-day returns to other clients (the "Disfavored Accounts"). Jacobson and Marian received ill-gotten gains of approximately $207,902 in excess first-day returns. Jacobson's scheme was halted when the custodian for the accounts he managed detected suspected cherry-picking by allocating trades to his clients according to performance and terminated his access to ARC's block account.

2.      ARC failed to adopt and implement policies and procedures reasonably designed to prevent violations of the Advisers Act by the firm and its supervised persons. In particular, ARC did not adequately monitor Jacobson's trading activity and failed to implement the policies set forth in its compliance manual requiring that block trades be pre-allocated in writing and that all allocations be reviewed to ensure that no clients were disadvantaged. ARC's Form ADV Part 2A (the firm's "brochure")—an investment adviser's primary disclosure document to its clients, which makes plain English disclosures about the adviser's business practices—contained statements that were false and misleading in light of Jacobson's cherry-picking and the firm's compliance failures. ARC also failed to meet certain recordkeeping requirements.

3.      By engaging in a cherry-picking scheme, defendant Jacobson violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder; Section 17(a)(1) of the Securities Act of 1933 ("Securities Act"); and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"). By its disclosure, compliance, and recordkeeping failures, defendant ARC violated Section 17(a)(2) of the Securities Act and Sections 206(2), 206(4) and Rule 206(4)-7 thereunder, and Section 204(a) of the Advisers Act and Rules 204-2(a)(7) and 204-2(a)(14) thereunder. The SEC seeks permanent injunctions, disgorgement with prejudgment interest, and civil penalties against Jacobson and ARC, and disgorgement of her ill-gotten gains from relief defendant

Marian.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this action pursuant to Sections 20(b),
20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§
77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the
Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),
78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1) and 214 of the
Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-
9(3)(1) & 90b-14.

5.     Defendants have, directly or indirectly, made use of the means or
instrumentalities of interstate commerce, of the mails, or of the facilities of a
national securities exchange in connection with the transactions, acts, practices and
courses of business alleged in this complaint.

6.     Venue is proper in this district pursuant to Section 22(a) of the
Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. §
78aa(a), and Section 214(a) of the Advisers Act, 15 U.S.C. § 80b-14, because
certain of the transactions, acts, practices and courses of conduct constituting
violations of the federal securities laws occurred within this district.  In addition,
venue is proper in this district because Jacobson and Marian reside in this judicial
district.

## DEFENDANTS

7.     **Steven J. Jacobson** (CRD # 2291673), age 54, resides in New
Orleans, Louisiana.  He was an IAR associated with ARC from October 2019 until
the firm terminated him in January 2021, as discussed below.  Between November
1992 and October 2019, Jacobson was a registered representative and IAR of
various entities that were dually registered as broker-dealers and investment
advisers.  Jacobson holds a Series 65 license and previously held Series 7 and 63

licenses.  He filed for bankruptcy in June 2020.  Jacobson has been the subject of multiple prior customer complaints.  Jacobson is currently an IAR associated with Union Capital Management Corp. (CRD #109670), a Louisiana-registered investment adviser to public pension funds and individual investors, with approximately $91.35 million in regulatory assets under management.

8.    **Advisor Resource Council** (CRD #164109), formerly known as 360 Wealth Management LLC, is a Texas limited liability company with its principal place of business in Dallas.  ARC has been registered with the Commission as an investment adviser since June 2012 and, according to its most recent Form ADV, has more than $2.3 billion in regulatory assets under management.  The firm supervises approximately 96 independent contractor IARs located across roughly 50 branch offices operating under different names in multiple states.

## RELIEF DEFENDANT

9.    **Marian Jacobson**, age 87, resides in New Orleans, Louisiana and is Steven Jacobson's mother.

## FACTS

### A.    Red Flags in Jacobson's Background

10.    Jacobson joined ARC in October 2019 after his prior firm fired him for inappropriate workplace behavior that did not involve securities or client harm.

11.    ARC's management knew that Jacobson's prior employer had terminated him.

12.    ARC's management also knew that Jacobson's ex-spouse had accused him  of misappropriating $450,000 from his sons' UTMA accounts.

13.    ARC thus required Jacobson to sign an addendum to the firm's standard IAR agreement attesting that he had no undisclosed compliance issues.

14.    ARC's then CEO was admittedly enticed by Jacobson's book of business and told the firm's other members that he "want[ed] to have a few guard

rails up" when bringing him on board.

15.    When onboarding Jacobson, ARC considered placing him on heightened supervision, but did not do so, though compliance staff committed to "watch [his] trading activity closely."

**B.    Jacobson's Cherry-Picking Scheme**

16.    Jacobson managed all client accounts on a discretionary basis and was compensated based on a percentage of assets under management.

17.    The accounts he managed were custodied at TD Ameritrade ("TDA"). ARC's primary custodian, LPL Financial, would not approve Jacobson due to the ongoing litigation.

18.    For the first nine months of his tenure at ARC, Jacobson typically placed trades in individual accounts. From July 31 to October 1, 2020, Jacobson placed option trades in the firm's block account at TDA and waited to allocate them until he had an opportunity to observe a trade's intraday performance.

19.    Most of his option trades were placed prior to 11 am ET, which increased the time Jacobson had to watch intraday performance because he waited until after 3 pm to allocate the vast majority of those trades, including frequently delaying allocation until after markets closed.

20.    A statistical analysis of the trading shows that Jacobson disproportionately allocated profitable option trades to the Favored Accounts and disproportionately allocated unprofitable trades to the Disfavored Accounts as set forth in the table below:

| Account Group | Number of Allocations Opening a Position | Total Investment Amount | Total First-Day Profits | First-Day Return On Investment | Winrate |
|---|---|---|---|---|---|
| Disfavored accounts | 595 | 3,039,437 | (201,009) | -7% | 28% |
| Jacobson and his mother | 88 | 487,598 | 248,567 | 51% | 65% |
| Other favored accounts | 167 | 840,314 | 316,670 | 38% | 56% |
| **Total** | **850** | **4,367,349** | **364,228** | **8%** | **37%** |

21.    Jacobson's allocations resulted in his mother and him receiving approximately $207,902 more than they would have if they had earned the average first-day return across all accounts that he managed.

22.    The probability that mere chance would result is such favorable allocations to Jacobson and his mother is less than a one-in-a-million chance.

23.    Jacobson frequently engaged in highly speculative trading by purchasing short-term out-of-money options, including options expiring the same day.  Jacobson engaged in this speculative trading even for clients who were risk-averse.  If an option expired worthless, he often allocated it to client accounts.

24.    Of the 50 trades with the worst first-day returns – most of which were options that expired worthless on the purchase date – Jacobson allocated only 6 of the 50 trades to his or his mother's accounts.

25.    Conversely, of the 50 trades with the highest first-day returns, Jacobson allocated 30 of the 50 trades to himself and his mother.

26.    The 50 trades with the worst first-day returns resulted in $414,942 in first-day losses to clients (97.3 percent of total losses) but only $11,340 in losses to Jacobson and Marian (2.7% percent of total losses).

27.    Jacobson claimed that he began trading in ARC's block account in July 2020 because the then CEO instructed him to do so to for "compliance reasons."  However, Jacobson was contradicted by ARC's CEO, who says that he never told Jacobson to use the block account.

28.    Jacobson also claimed that before each block trade, he handwrote the planned allocation on a trade ticket, which he retained in his office files.  But ARC's then CEO and Jacobson's assistant never saw a written trade allocation in Jacobson's office.

### C.    TDA's Investigation and Termination of Jacobson for Cherry-Picking

29.    In late September 2020, TDA discovered possible cherry-picking by Jacobson.

30.    On October 1, 2020, TDA informed ARC that Jacobson was under investigation based on his August and September block trading activity and that it was removing his access to the firm's block account.

31.    Two weeks later, TDA notified ARC that it was immediately terminating Jacobson's access to its platform.

32.    Although TDA did not expressly tell Jacobson he was being barred from its platform on suspicion of cherry-picking, the next day, Jacobson nonetheless texted an ARC principal: "I'm otb . . . Out the biz," "I f*cked up" and "This is scary."

### D.    ARC's Alarmed Reaction and Inadequate Response to TDA's Investigation

33.    Upon learning of TDA's investigation, ARC's principals exchanged Slack messages expressing alarm.  The Chief Investment Officer ("CIO") wondered why Jacobson was not pre-allocating trades, but no one mentioned the firm's pre-allocation requirement or questioned what, if anything, had been done to

implement it.  After a quick review of the trade blotter, the CIO characterized

Jacobson's option trading as "very speculative."  Shortly thereafter, ARC's CCO

wrote, "of course they're [TDA] looking at him," describing the returns in

Jacobson's personal account and certain others as "outrageous."  Later that month,

the CCO wrote in an internal Slack message that Jacobson was "gambling" with

his mother's account: "no wonder TD wants her account gone.  I can't believe we

didn't see this."

34.    After TDA notified ARC of its investigation, its CCO began

reviewing Jacobson's trading activity.  She informed Jacobson that he had

"circumvent[ed] system checks for margin and option level approvals" by trading

in the block account.  However, the CCO then told Jacobson that ARC was not

imposing any formal discipline for these issues at this time as the firm had a

responsibility to create effective checks and balances to prevent circumstances like

this. .

35.    For months, even after TDA terminated Jacobson's access to its

platform, ARC still allowed Jacobson to manage client assets by letting Jacobson

place client trades through a licensed assistant.

36.    In December 2020, the CEO instructed Jacobson to enter a residential

facility for treatment of suspected drug abuse.

37.    ARC fired Jacobson on January 20, 2021..

**E.    Jacobson Acted Unreasonably and With Fraudulent Intent**

38.    Jacobson knowingly or recklessly engaged in a fraudulent scheme to

cherry-pick securities trades for the benefit of the favored accounts, to the

detriment of the disfavored accounts.  He further acted unreasonably and therefore

negligently when carrying out the cherry-picking scheme.

**F.    ARC and Jacobson's Role as Investment Advisers**

39.    During all relevant times, ARC and Jacobson both acted as investment

advisers.

40.    ARC provided investment advice to clients in exchange for a fee based on a percentage of assets under management.

41.    ARC has been registered with the Commission as an investment adviser since June 2012 and, according to its most recent Form ADV, has more than $2.3 billion in regulatory assets under management.

42.    Jacobson made all of the investment decisions for the securities trading in ARC accounts he managed.

43.    Jacobson and ARC were compensated for managing ARC client accounts and directly benefitted from the advisory fees charged by ARC.

**G.    False and Misleading Statements in ARC's Forms ADV Part 2A**

44.    ARC's March 28, 2020 Form ADV Part 2A brochure stated: "We and our employees avoid any circumstances that might adversely affect, or appear to affect, our duty of loyalty" and that the firm's "allocation procedure seeks to be fair and equitable to all clients with no particular group or client being favored or disfavored over any other."

45.    Given the cherry-picking scheme alleged above and the firm's failure to adopt and implement policies and procedures reasonably designed to prevent cherry-picking, each of these statements was false.  By allowing winning trades to be allocated to the Favored Accounts and losing trades to the Disfavored Accounts, ARC and Jacobson did not allocate trades fairly or equitably, and permitted some clients to be disfavored.

46.    It would have been important to ARC's advisory clients to know that, contrary to the representations made to clients, ARC was not taking reasonable steps to ensure that trades made through the TDA platform block account were allocated fairly or equitably, or in a way that was consistent with the law.

47.    ARC's March 15, 2019 and March 28, 2020 Form ADV Part 2A

brochures also stated: "All of our advice is based on an assessment of each client's individual needs, which we identify at the onset of each relationship. . . . We review each client's individual investments and investment profile at least as frequently as annually."

48.     These statements were misleading.  As set forth below, the firm failed to ascertain investment objectives for clients custodied on the TDA platform prior to at least March 2020 and failed to conduct meaningful reviews of Jacobson's activity prior to learning of TDA's investigation.

49.     It would have been important to ARC's advisory clients custodied on the TDA platform to know that, contrary to the representations made to clients, from at least October 2019 through March 2020, ARC could not adequately monitor the suitability of its IARs' investment decisions since it lacked knowledge of their TDA-custodied clients' objectives and risk tolerance.

### H.    ARC's Compliance Failures

#### 1.    Compliance Structure

50.     The independent contractor structure utilized by ARC made it difficult to develop and implement an effective supervisory program.  In 2019, ARC had 74 IARs spread across approximately 40 branch offices in multiple states being supervised by only three compliance staff located in Dallas.

51.     ARC's business model placed stress on a small compliance staff.

52.      ARC failed to adopt and implement an adequate supervisory system and procedures reasonably designed to prevent violations of the Advisers Act.  For example, ARC required new IARs to complete an "Investment Process Review" form describing their portfolio management processes, but failed to conduct sufficient reviews to ensure that IARs were actually following their stated processes.

53.     Further, ARC failed to proactively monitor trading for clients

custodied on the TDA platform, including for suitability, and instead employed a system that inadequately relied on broker-dealers' alerts. ARC was required by the Advisers Act to adopt and implement policies and procedures reasonably designed to prevent violations relating to IARs' portfolio management, including cherry-picking.

## 2.    Failure to Implement Policies and Procedures

### *Trade Allocations*

54.    ARC failed to adopt and implement policies and procedures reasonably designed to ensure that its IARs used the firm's block account at TDA appropriately and that allocations were fair to clients.

55.    ARC's compliance manual required the firm to "designate on the trade ticket the number of shares of the block trade to be allocated to each specific account prior to placing the order," but the firm did not implement this policy with respect to clients custodied at TDA.

56.    ARC's compliance manual also stated that all allocations would be reviewed to "verify that no client account was systematically disadvantaged by the allocation." ARC did not perform those reviews for clients custodied on the TDA platform.

### *Oversight of Portfolio Management and Suitability*

57.    ARC also failed to implement policies and procedures reasonably designed to ensure adequate monitoring of IARs' investment processes, trading activity, and suitability of client recommendations.

58.    For example, contrary to ARC's policies and procedures, Jacobson was never required to complete an Investment Process Review form describing his investment process, and ARC failed to complete an Investment Process Supervisory Review.

59.    Additionally, ARC learned in March 2020 that it did not have

information regarding the investment objectives for any of the hundreds of client accounts custodied at TDA, including those managed by Jacobson. Thus, from at least October 2019 through March 2020, ARC could not adequately monitor the suitability of its IARs' investment decisions since it lacked knowledge of their clients' objectives and risk tolerance.

60.    Even after client objectives were documented via negative consent letters sometime after March 2020, ARC failed to adequately review Jacobson's investment activity, including for suitability, prior to learning of TDA's investigation in October.

### I.    ARC Failed to Maintain Required Books and Records

61.    ARC did not keep records of the dates that its ADV, including Parts 2A and 2B, was initially given or offered to each of Jacobson's clients or prospective clients as required by Rule 204-2(a)(14)(i). Additionally, ARC did not maintain copies of the negative consent letters sent to clients as required by Rule 204-2(a)(7)(i); counsel represented that the letters would have to be regenerated for production using mail merge files.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### (Against Defendant Jacobson)

62.    The SEC realleges and incorporates by reference paragraphs 1 through 61 above.

63.    As alleged above, defendant Jacobson engaged in a scheme to defraud clients, and engaged in acts, practices or courses of business that operated as a fraud upon clients, by cherry-picking favorable trades for the Favored Accounts and allocating poor trades to the Disfavored Accounts, which sustained substantial first-day losses as a result.

64.     By engaging in the conduct described above, defendant Jacobson, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

65.     Defendant Jacobson, with scienter, employed devices, schemes and artifices to defraud; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

66.     By engaging in the conduct described above, defendant Jacobson violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Violations of Sections 17(a)(1) of the Securities Act
### (against Defendant Jacobson)

67.     The SEC realleges and incorporates by reference paragraphs 1 through 61 above.

68.     As alleged above, defendant Jacobson engaged in a scheme to defraud clients, and engaged in acts, practices or courses of business that operated as a fraud upon clients, by cherry-picking favorable trades for the Favored Accounts and allocating poor trades to the Disfavored Accounts, which sustained substantial first-day losses as a result.

69.     By engaging in the conduct described above, defendant Jacobson, directly or indirectly, in the offer or sale of securities, and by the use of means or

instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly employed devices, schemes, or artifices to defraud.

70.    Defendant Jacobson, with scienter, employed devices, schemes and artifices to defraud.

71.    By engaging in the conduct described above, defendant Jacobson violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. §§ 77q(a)(1).

## THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a)(2) of the Securities Act
### (against Defendant ARC)

72.    The SEC realleges and incorporates by reference paragraphs 1 through 61 above.

73.    As alleged above, defendant ARC obtained money by means of untrue statements of material fact in its Form ADV Part 2A.  ARC violated Section 17(a)(2) of the Securities Act by falsely stating in its Form ADV Part 2A that the firm and its employees "avoid any circumstances that might adversely affect, or appear to affect, our duty of loyalty" and that allocations of block trades would be "fair and equitable to all clients with no particular group or client being favored or disfavored over any other."  The Form ADV also stated: "All of our advice is based on an assessment of each client's individual needs, which we identify at the onset of each relationship . . . . We review each client's individual investments and investment profile at least as frequently as annually."  This representation was misleading in light of the firm's inadequate oversight of trading and suitability, including its failure to determine TDA-custodied clients' investment objectives for at least six months.

74.     ARC was, at a minimum, negligent in making these statements without disclosing that it had failed to implement its policies requiring pre-allocation of block trades, daily review of allocations, and ARC oversight of client trading and the suitability of client investments.

75.     ARC obtained money by means of the misleading statements as required by Section 17(a)(2) because it received a portion of the management fees paid by Jacobson's clients, who would not have used him as their adviser had they known the truth..

76.     By engaging in the conduct described above, defendant ARC, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.     Defendant ARC, with negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.     By engaging in the conduct described above, defendant ARC violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## FOURTH CLAIM FOR RELIEF

### Fraud by an Investment Adviser

### Violations of Sections 206(1) and 206(2) of the Advisers Act

### (against Defendant Jacobson)

79.     The SEC realleges and incorporates by reference paragraphs 1

COMPLAINT                                    15

through 61 above.

80.     As alleged above, defendant Jacobson engaged in a scheme to defraud clients, and engaged in acts, practices or courses of business that operated as a fraud upon clients, by cherry-picking favorable trades for the Favored Accounts and allocating poor trades to the Disfavored Accounts, which sustained substantial first-day losses as a result.  Defendant Jacobson had an adviser-client relationship with, and therefore owed a fiduciary duty to, each of his clients.  Jacobson breached his fiduciary duty by carrying out a cherry-picking scheme.  At all relevant times, defendant Jacobson acted knowingly or recklessly when carrying out this fraud.

81.     By engaging in the conduct described above, defendant Jacobson, directly or indirectly, by use of the mails or means of instrumentalities of interstate commerce:  (a) employed devices, schemes or artifices to defraud clients or prospective clients, and (b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

82.     By engaging in the conduct described above, defendant Jacobson violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

<u>**FIFTH CLAIM FOR RELIEF**</u>

**Violations of 206(2) of the Advisers Act**

**(against Defendant ARC)**

83.     The SEC realleges and incorporates by reference paragraphs 1 through 61 above.

84.     As alleged above, ARC violated Section 206(2) of the Advisers Act by falsely stating in its Form ADV Part 2A that the firm and its employees "avoid any circumstances that might adversely affect, or appear to affect, our duty of loyalty" and that allocations of block trades would be "fair and equitable to all

clients with no particular group or client being favored or disfavored over any other." The Form ADV also stated: "All of our advice is based on an assessment of each client's individual needs, which we identify at the onset of each relationship . . . . We review each client's individual investments and investment profile at least as frequently as annually." This representation was misleading in light of the firm's inadequate oversight of trading and suitability, including its failure to determine TDA-custodied clients' investment objectives for at least six months.

85.    ARC was negligent in making these statements without disclosing that it had failed to implement its policies requiring pre-allocation of block trades, daily review of allocations, and ARC oversight of client trading and the suitability of client investments.

86.    By engaging in the conduct described above, defendant ARC, directly or indirectly, by the use of the mails or any means of interstate commerce, engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon any client or prospective client.

87.    By engaging in the conduct described above, defendant ARC violated Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## SIXTH CLAIM FOR RELIEF

### Violations of 206(4) of the Advisers Act and Rule 206(4)-7
### (against Defendant ARC)

88.    The SEC realleges and incorporates by reference paragraphs 1 through 61 above.

89.    As alleged above, defendant ARC violated Section 206(4) of the Advisers Act and Rule 206(4)-7 by failing to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and its rules.

90.     As set forth above, ARC had written policies and procedures requiring, among other things, that advisers pre-allocate block trades.  The compliance manual also required the firm to review all allocations to ensure that no client was systematically disadvantaged.  ARC, however, failed to implement these policies and procedures and thereby violated Section 206(4) of the Advisers Act and Rule 206(4)-7.

91.     By engaging in the conduct described above, defendant ARC violated Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and unless restrained and enjoined, will continue to violate Section 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(4) and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7.

## SEVENTH CLAIM FOR RELIEF
### Violations of 204(a) of the Advisers Act and
### Rules 204-2(a)(7)(i) and 204-2(a)(14)(i) thereunder
### (against Defendant ARC)

92.     The SEC realleges and incorporates by reference paragraphs 1 through 61 above.

93.     Section 204(a) of the Advisers Act and Rule 204-2 thereunder require investment advisers to make and keep accurate copies of specified books and records.  ARC failed to maintain (1) records of the initial dates that its Form ADV (including parts 2A and 2B) was given or offered to each of Jacobson's clients or prospective clients and (2) copies of the negative consent letters sent to clients, as required by Section 204(a) of the Advisers Act and Rules 204-2(a)(14)(i) and 204-2(a)(7)(i), respectively.

94.     By engaging in the conduct described above, defendant ARC violated Section 204(a) of the Advisers Act and Rules 204-2(a)(14)(i) and 204-2(a)(7)(i), and unless restrained and enjoined, will continue to violate Section 204(a) of the

Advisers Act, 15 U.S.C. § 80b-4(a), and Rules 204-2(a)(14)(i) and 204-2(a)(7)(i), 17 C.F.R. §§ 275.204-2(a)(14)(i) and 275.204-2(7)(i), respectively.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Jacobson, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1) & 80b-6(2)].

### **III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily, and permanently enjoining defendant ARC, and its agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)], Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)], Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and and Rule 206(4)-7 thereunder, [17 C.F.R. § 275.206(4)-7], and Section 204(a) of the Advisers Act, 15 U.S.C. § 80b-4(a), and Rules 204-2(a)(14)(i) and 204-2(a)(7)(i) thereunder, [17 C.F.R. §§ 275.204-2(a)(14)(i) and

275.204-2(7)(i)], respectively.

**IV.**

Order Defendants ARC and Jacobson to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**V.**

Order Relief Defendant Marian to disgorge the excess trading profits, together with prejudgment interest thereon, that she received from Jacobson's illegal conduct pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**VI.**

Order Defendant ARC to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**VII.**

Order Defendant Jacobson to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**VIII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may determine to be just and necessary.

September 29, 2023                    Respectfully submitted,

                                     */s/ Lynn M. Dean*

                                     LYNN M. DEAN
                                     California Bar No. 205562
                                     COLLEEN M. KEATING
                                     California Bar No. 261213
                                     SECURITIES AND EXCHANGE
                                     COMMISSION
                                     444 S. Flower Street, 9th Flr.
                                     Los Angeles, CA 90071
                                     (323) 965-3213
                                     (213) 443-1904 (facsimile)
                                     deanl@sec.gov
                                     keatingc@sec.gov

                                     COUNSEL FOR PLAINTIFF
                                     SECURITIES AND EXCHANGE
                                     COMMISSION