## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**SECURITIES AND EXCHANGE**
**COMMISSION**                                    **CIVIL ACTION**

**VERSUS**                                         **NO: 23-5650**

**STEVEN JACOBSON, ET AL.**                        **SECTION: "H"**

### ORDER AND REASONS

Before the Court is Defendant Steven Jacobson's Motion in Limine to Exclude the Testimony and Opinions of Eugene P. Canjels, Ph.D. (Doc. 47); Plaintiff Security and Exchange Commission's Motion in Limine to Exclude Export Reports and Opinions of Dr. David A. Lesmond (Doc. 48); and Defendant Steven Jacobson's Motion for Summary Judgment (Doc. 49). Oral argument on the Motions were held on March 27, 2025.

For the following reasons, Defendant's Motion in Limine to Exclude the Testimony and Opinions of Eugene P. Canjels, Ph.D. is **DENIED**; Plaintiff Security and Exchange Commission's Motion in Limine to Exclude Export Reports and Opinions of Dr. David A. Lesmond is **GRANTED**; and Defendant's Motion for Summary Judgment is **DENIED**.

### BACKGROUND

On September 29, 2023, the United States Securities and Exchange Commission ("SEC") filed this civil suit, alleging various violations of the Securities Exchange Act of 1934 ("Exchange Act")[1], Securities Act of 1933

---

[1] 15 U.S.C. § 78j(b).

("Securities Act")[2], and Investment Advisers Act of 1940 ("Advisers Act")[3] by Defendants Steven Jacobson, his mother Marian Jacobson, and Adviser Resource Council ("ARC").[4] ARC is a registered investment adviser where Jacobson was formerly employed as a Louisiana-based investment adviser representative ("IAR").

In its Complaint, the SEC alleges that Defendant engaged in a cherry-picking scheme from July 31, 2020 to October 1, 2020 (the "Relevant Period") in which he disproportionately allocated option trades with positive returns between the time of the trade and the time of the allocation ("first-day returns") to his personal account, to an account in his mother's name, and 3 other favored client accounts (collectively, the "Favored Accounts"), while disproportionately allocating option trades with negative first-day returns to other clients (collectively, the "Disfavored Accounts"), which sustained substantial first-day losses as a result.[5] The SEC alleges that Defendant would place option trades in the firm's block account at TD Ameritrade ("TDA") and would wait to allocate them until after he had an opportunity to observe a trade's intraday performance. The SEC alleges this scheme resulted in ill-gotten gains of approximately $207,902 across the Favored Accounts.

Defendant Jacobson now moves this Court to exclude the testimony of Plaintiff SEC's expert, Eugene P. Canjels, Ph.D. and grant summary judgment in his favor. Plaintiff opposes.[6] Additionally, Plaintiff moves this Court to

---

[2] 15 U.S.C. § 77q(a)(1).

[3] 15 U.S.C. § 80b-6(1), (2). .

[4] Marian Jacobson is named as a Relief Defendant in the Complaint. Doc. 1 at 4. On February 16, 2024, the Court approved a consent judgment between Plaintiff and Defendant ARC, which resolved all civil claims against ARC in this case. Doc 17. As such, "Defendant" stands for Steven Jacobson throughout.

[5] Plaintiff alleges that during the Relevant Period, Defendant executed 256 option trades from which he made 850 allocations. Doc. 47-4 ¶ 30.

[6] Docs. 52, 53.

exclude the testimony of Defendant Jacobson's expert, Dr. David A. Lesmond. Defendant opposes.[7]  The Court will consider these motions in turn.

## LEGAL STANDARD

### I.    Summary Judgement

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[8]  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[10]  "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[11]  Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[12]  "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-

---

[7] Doc. 54.
[8] FED. R. CIV. P. 56(c).
[9]  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[10] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528 (5th Cir. 1997).
[11] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[12] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

movant would bear the burden of proof at trial."[13]  "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[14]   Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[15]

## II.   Expert Testimony

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The current version of Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*,[16] and *Kumho Tire Co. v. Carmichael*[17] as well as the 2023 amendments.[18] The threshold inquiry is whether the expert possesses the requisite qualifications to render opinion on a particular subject

---

[13] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

[14] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).

[15] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

[16] 509 U.S. 579 (1993).

[17] 526 U.S. 137 (1999).

[18] "[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule. *See* Rule 104(a)." FED. R. OF EVID. 702 advisory committee's note to 2023 amendment.

matter.[19]  Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant.[20]

As the "gatekeeper" of expert testimony, the trial court enjoys broad discretion in determining admissibility.[21] Still, courts must give proper deference to the traditional adversary system and the role of the jury within that system.[22] First, to assess reliability, a court considers whether the reasoning or methodology underlying the expert's testimony is valid.[23] The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[24] Courts should exclude testimony based merely on subjective belief or unsupported speculation.[25] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[26] After assessing reliability, a court evaluates relevance.[27] In doing so, a court must determine whether the expert's reasoning or methodology "fits" the facts of the case, is reasonably applied to the facts of the case in such a way that ensures there is not "too great an

---

[19] Wagoner v. Exxon Mobil Corp., 813 F. Supp. 2d 771, 799 (E.D. La. 2011); *see also* Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.").

[20] *See* United States v. Valencia, 600 F.3d 389, 424 (5th Cir. 2010); s*ee also* Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 881–82 (5th Cir. 2013).

[21] *Wellogix, Inc.* at 881; *but see* FED. R. EVID. 702 advisory committee's note to 2023 amendment (While "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. . . [t]hese rulings are an incorrect application of Rules 702 and 104(a).")

[22] *See Daubert,* 509 U.S. at 596.

[23] *See id.* at 592–93.

[24] *See* Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998).

[25] *See Daubert*, 509 U.S. at 590.

[26] *Id.* at 596.

[27] Burst v. Shell Oil Co., 120 F. Supp. 3d 547, 551 (E.D. La. June 9, 2015).

analytical gap between the data and opinion proffered,"[28] and will thereby assist the trier of fact in understanding the evidence.[29]

Federal Rule of Evidence 703 further provides that an expert may offer opinions based on otherwise inadmissible facts or data, but only if (1) they are of the kind reasonably relied upon by experts in the particular field and (2) the testimony's probative value substantially outweighs its prejudicial effect.[30]

## LAW AND ANALYSIS

Plaintiff alleges that during the Relevant Period, Defendant carried out a fraudulent cherry-picking scheme, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a), (c); Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), (3); and Sections 206(1) and(2) of Advisers Act, 15 U.S.C. § 80b-6(1), (2). Cherry-picking has been defined as:

> a practice by which an investment adviser purchases a security, waits to evaluate its performance, and then allocates it to [here, Favored Accounts] if it "pops," or goes up quickly within a short period of time. To explain this another way, an investment adviser engaging in cherry picking buys securities in blocks without determining an intended recipient. Then, between trade day and settlement day, he watches the security's performance. If the value increases significantly, he allocates the security to [Favored Accounts], thus picking the "cherry" for [these accounts]. However, if the value decreases prior to settlement, or if it stays the same, the investment adviser allocates the security to [Disfavored Accounts], thus leaving them the "pit."[31]

"[S]everal courts (and the SEC) have found that cherry-picking can be a violation of Section 10(b), Rule 10b-5, Section 17(a)(1), and Sections 206(1) and

---

[28] Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)

[29] *See Burst* at 551.

[30] FED. R. EVID. 703.

[31] Sec. & Exch. Comm'n v. Slocum, Gordon & Co., 334 F. Supp. 2d 144, 161-62 (D.R.I. 2004).

(2)."[32] Failure to disclose cherry-picking amounts to material representations or omissions because it creates "a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest."[33] "Because cherry-picking involves allocating more profitable trades to certain accounts, an adviser is 'stealing from one customer to enrich himself,' and thus the practice implicates a conflict of interest."[34] "To prevail at trial, [Plaintiff] must prove that a cherry-picking scheme existed"[35] and "need only establish cherry-picking by a preponderance of the evidence."[36]

In his Motion for Summary Judgment, Defendant argues that the three counts against him cannot be sustained without underlying evidence that cherry-picking occurred; Plaintiff does not oppose this supposition. All three counts are treated by the parties in their respective briefings for the instant Motion for Summary Judgment as if they "rise and fall together insofar as they are based on the factual contention that [Defendant] cherry-picked trades."[37]

Though it submitted deposition testimony from Defendant and other ARC professionals with knowledge of the Relevant Period and its goings on, as well as various other documents,[38] Plaintiff relies heavily on reports and testimony of Dr. Canjels to carry its burden in proving that cherry-picking occurred. Further, the Court agrees with Plaintiff that the undisputed trading data before both Canjels and Lesmond is the "most probative contemporaneous

---

[32] Sec. & Exch. Comm'n v. World Tree Fin., L.L.C., 43 F.4th 448, 460–61 (5th Cir. 2022).

[33] ABC Arbitrage Plaintiffs Grp. v. Tchuruk, 291 F.3d 336, 359 (5th Cir. 2002) (internal quotations marks omitted).

[34] *World Tree Fin.*, 43 F.4th at 461 (quoting Dratel Grp., Inc. & William M. Dratel for Rev. of Action Taken by Finra, Release No. 77396 (Mar. 17, 2016)).

[35] United States Sec. & Exch. Comm'n v. Paris, No. 21-CV-3450, 2024 WL 4433614, at *7 (N.D. Ill. Oct. 7, 2024) (quoting *Slocum, Gordon & Co.*, 334 F. Supp. 2d at 176).

[36] *Id.* (quoting *Slocum, Gordon & Co.*, 334 F. Supp. 2d at 146).

[37] *Id.*

[38] Docs. 53-4–53-16.

evidence in this case."[39] As such, the question of whether Dr. Canjels' opinions and testimony are admissible is critical for this Court to answer prior to ruling on Defendant's Motion for Summary Judgment.

## I.    Defendant's Motion in Limine to Exclude the Testimony and Opinions of Eugene P. Canjels, Ph.D.

In his Motion in Limine, Defendant asks the Court to exclude the testimony and opinions of Plaintiff's expert witness, Dr. Canjels. Particularly, Defendant asks that the Court exclude the report that Dr. Canjels produced on Plaintiff's behalf, arguing that there are several shortcomings in its analysis that result in conclusions that may mislead a jury if allowed at trial.[40] Defendant's Motion attacks Dr. Canjels' report and its conclusions, *inter alia*, on the grounds that there is no mention of the pre-allocation evidence; there is no analysis of whether the trades followed these alleged pre-allocations; and provides no basis for concluding that cherry-picking occurred. Plaintiff opposes each of Defendant's concerns and ultimately asserts that these issues go to the weight and credibility of Dr. Canjels' testimony, not its admissibility.

Statistical evidence "'is a means to establish or defend against liability' and '[i]ts permissibility turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action.'"[41] "Statistical evidence can be useful in securities cases, and its admission is no

---

[39] *See* Doc. 52 at 21.

[40] Dr. Canjels is as Assistant Director with the Office of Litigation Economics in the Division of Economic and Risk Analysis of the SEC. Doc. 47-4 at 3 ¶1. Importantly, while Defendant alludes to the fact that this is only the second case for which Dr. Canjels has been deposed regarding his expert opinion, he does not dispute that Dr. Canjels has the proper qualifications to render his opinion.

[41] *World Tree Fin.*, 43 F.4th at 461–62 (quoting Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 454–55 (2016)).

novelty."[42] "Of course, a statistical analysis is only as reliable as the assumptions beneath it."[43] "Because cherry-picking is 'difficult to detect,' determining whether it has occurred 'often requires drawing inferences from a pattern of behavior, irregularities, and trading data.'"[44]

In his report, Dr. Canjels was asked by Plaintiff to analyze the trading data from the Relevant Period to determine if Defendant's trading was consistent with cherry picking. Dr. Canjels based his analysis on TDA trading records, account statements, and publicly available data. He summarized his opinions and the bases on which they were formed in an opening report submitted to opposing counsel on November 8, 2024, and a rebuttal report sent on December 26, 2024.[45] In his report, Dr. Canjels ultimately concluded that Defendant did engage in cherry-picking during the Relevant Period.[46]

Dr. Canjels begins his report by describing the scope of his assignment—namely, to review trading activities in accounts managed by Defendant and if cherry-picking was found, determine which accounts were favored—and the data he used to form his subsequent opinions, including the Complaint, trading records provided by TDA and publicly available information.[47] As to the data he considered, Dr. Canjels states in his report that he considered trade and allocation information for trades in ARC's block account for the time between May 17, 2019 and July 30, 2021 and direct trades.[48] Dr. Canjels states that he limited his analysis to allocations in which an option position was opened because, according to the data before him, Defendant opened option positions

---

[42] *Id.* at 462.

[43] *Id.* at 462-463.

[44] *Id.* at 462.

[45] Docs. 47-4, 48-6.

[46] *Id.* at 6-7.

[47] *Id.* at Appendix B.

[48] *Id.* at 7. Direct trades are those that were "made directly on behalf of specific accounts and therefore do not provide an opportunity for" cherry-picking. Doc. 47-4 at 8.

in his account and his clients' accounts primarily through trading in the block account but did not often use the block account to close the option positions except when he was day trading.[49] Dr. Canjels looked at the timing of trades, allocations, and closing out of the allocated trades before assessing if Defendant based his allocation decisions on the return of the option between the time it was traded in the block account and the time it was allocated.[50]

Dr. Canjels reached several conclusions based on his analysis and the differences he observed in first-day returns. He found that Defendant "disproportionately allocated option opening trades with positive first-day profits to his personal account and [the Favored Accounts], while disproportionately allocating option opening trades with negative first-day profits to [the Disfavored Accounts]."[51] Dr. Canjels also found that "[t]he observed difference in first-day returns are indicative of cherry-picking based on three sets of analyses" that show: statistically significant first-day returns and win rates between the Favored and Disfavored Accounts; the differences in performance between these groups of accounts cannot be explained by differences in trading strategy; and when Defendant did not have an opportunity to cherry-pick trades, the systemic differences in first-day returns between the groups of accounts was nonexistent.[52]

Defendant makes a variety of arguments in his Motion as to why Dr. Canjels' testimony and opinions should be excluded[53] but has two main

---

[49] *Id.* at 8.
[50] *Id.* at 13.
[51] *Id.* at 6-7.
[52] *Id.* at 7.
[53] Defendant states that Dr. Canjels did not follow any SEC methodology or protocol when preparing report, implying that a failure to do in some way jeopardizes the credibility of its conclusions. The Court finds that because Dr. Canjels testified that he based his report on "training, expertise, and experience," the lack of using some predetermined model for his analysis does not undermine his report or its conclusions. Doc. 47-3 at 18. Defendant implies that Dr. Canjel's comment that Defendant's motivations are outside of the scope of

arguments which he emphasized in his Motion and at oral argument. Defendant argues that Dr. Canjels' report fails under *Daubert* because he is circular in his reasoning and Dr. Canjels relies on a univariate, as opposed to multivariate approach, to the data before him.[54]

According to Defendant, Dr. Canjels created a "self-fulfilling analytical framework" by using the same performance data both to identify Favored Accounts and to prove that cherry-picking occurred.[55] He claimed at oral argument that in a "black box" process, Dr. Canjels selected the groups on Plaintiff's behalf in the first place, making his testing of those groups' performance suspect. Plaintiff responds that Dr. Canjels was conservative in his consideration of non-favored accounts as Disfavored Accounts, with the latter group including all client accounts under Defendant's control that received allocated options.[56] According to Plaintiff, this shows not that Dr. Canjels' report was outcome-driven, but rather cautious. Also, Plaintiff asserts that the null hypothesis[57] from which Dr. Canjels ran his tests was that there was no cherry-picking, and that Defendant did not know how they would perform when he made allocations decisions.

---

his report undermines its results. Doc. 47-1 at 9. While scienter is an element of a successful cherry-picking claim, the Court notes that other circumstantial evidence can be introduced by Plaintiffs to prove it to a factfinder. *World Tree Fin.*, 43 F.4th at (quoting Sec & Exch. Comm'n v. Fox, 855 F.2d 247, 253 (5th Cir. 1988) ("[I]t is well settled that 'scienter may be established by circumstantial evidence.'")). Defendant also argues that the data set from which Dr. Canjels drew his conclusion is too small to be representative, but the Court cannot find fault with Dr. Canjels' report because the Relevant Period in question was only two months long.

[54] Doc. 47-1 at 10.

[55] *Id.* at 9.

[56] Doc. 52 at 7.

[57] A null hypothesis is defined as "or example, a hypothesis that there is no difference between two groups from which samples are drawn." National Academies of Sciences, Engineering, and Medicine. 2011. Reference Manual on Scientific Evidence: Third Edition. Washington, DC: The National Academies Press. https://doi.org/10.17226/13163.

Defendant further asserts that Dr. Canjels' report is unreliable because its univariate approach does not account for such variables as trading strategy linked to Defendant's alleged prowess as an investor to explain why there are such differences in the Favored and Unfavored Accounts, stating that it "ignore[es] the vast array of legitimate trading practices that could explain the observed return patterns."[58] As a result, Defendant asserts that Dr. Canjels' statistical testing creates an artificial binary choice between random chance and fraud.[59] Plaintiff disagrees, noting that Defendant's own expert did not account for Jacobson's "strategies" either, and that Dr. Canjels "performed a series of statistical tests to examine whether there could be any explanation other than cherry-picking for the difference in performance between the Favored and Disfavored Accounts."[60] He found that there was no other logical explanation for the outcome of his tests[61]; "[e]ach methodology demonstrated that it is highly unlikely that the actual performance of the accounts was the mere product of chance."[62]

The arguments made by Defendant here mirror some of those made by the defendant in the Fifth Circuit opinion in *Securities and Exchange Commission v. World Tree Financial, L.L.C.*[63] In that case, as here, the defendants challenged the lower court's admission of the SEC's expert's testimony and opinion in a bench trial, arguing that the expert there "used 'unrealized 'first day results,' which show only unrealized gains and losses'; she did not use a 'comparator'; she disregarded differences between Favored and Disfavored accounts; she employed a result-driven approach; and she did not

---

[58] Doc. 47-1 at 16.
[59] *Id.* at 16.
[60] Doc. 52 at 25.
[61] Doc. 47-4 at 21.
[62] Doc. 52 at 11.
[63] 43 F.4th 448 (5th Cir. 2022).

use all available information . . ."[64] Also, like the expert's conclusions in *World Tree Financial*, Dr. Canjels' analysis led to his opinion that there was "less than a one in one million chance" that the patterns in Defendant's trading could have occurred if the allocations were made without cherry-picking.[65] The Fifth Circuit affirmed the lower court's admission of the SEC's expert based on an analysis very similar to the one at issue here, and several other courts have found similar expert reports reliable and the accompanying expert's testimony admissible.[66]

The Court finds that Defendant's arguments concerning the reliability of Dr. Canjels' "statistical analysis do not render his opinions inadmissible [; i]nstead, they raise questions that must be resolved by a factfinder at trial."[67] As such, Defendant's challenges to Dr. Canjel's analysis and opinions raise credibility questions for the jury to answer.[68] Considering its own understanding of the tests performed by Dr. Canjels to reach his conclusions and the Fifth Circuit's affirmation of the lower court's admission of the comparable expert testimony and report in *World Tree Financial*, the Court finds that the reasoning and methodology used by Dr. Canjels is reliable[69] and that it fits the facts at issue here is such a way that will aid the factfinder.[70]

---

[64] *Id.* at 462-63.

[65] Doc. 47-4 at 19.

[66] *See* Sec. & Exch. Comm'n v. Werthe, No. 23CV0815, 2025 WL 790970, at *1 (S.D. Cal. Mar. 12, 2025) (finding that an SEC expert's testimony was admissible where she concluded that the investor's disproportionate returns were due to cherry picking and not investment strategy by analyzing the investor's direct trades); *see also* Sec. & Exch. Comm'n v. Susoeff, No. 2:23-CV-173, 2024 WL 3938488, at *1 (D. Nev. Aug. 23, 2024) (finding that an SEC expert's testimony was admissible where he "employed several tests and analyzed all the data available" before concluding the investor was engaging in cherry-picking pursuant to Federal Rule of Evidence 702's mandate to filter out "unreliable nonsense opinions, not to exclude opinions merely because they are impeachable.") *Id.* at *7–8 (quoting City of Pomona v. SQMN. Am. Corp., 750 F.3d 1036, 1044) (9th Cir. 2014)).

[67] *Paris*, 2024 WL 4433614, at *11.

[68] *See id.*

[69] *See Daubert,* 509 U.S. at 592-93.

[70] See *Burst*, 120 F. Supp. 3d at 551 (E.D. La. June 9, 2015).

Accordingly, Dr. Canjels' report, opinions and testimony concerning his statistical analysis of trading data are admissible.[71]

## II.  **Defendant's Motion for Summary Judgment**

In his Motion for Summary Judgment, Defendant relies on the Court's exclusion of Dr. Canjels' report and opinion, as well as his own production of what he believes is clear evidence of pre-allocation, to rule in his favor. Plaintiff opposes, arguing that the pre-allocation documentation that Defendants relies on to make his argument is uncontroverted, and therefore, not a sound basis upon which this Court can grant summary judgment.

Defendant's Motion is dedicated in large part to detailing his process of creating, storing, and ultimately locating (some of) the pre-allocation sheets that he allegedly prepared as a part of his regular practice. According to Defendant, while "[m]ost brokers who buy securities in a block account use software that allocates the trades as part of the order entry process," the TD system Defendant was using did not have this feature.[72] Brokers at ARC used another piece of software, Thinkstream, to pre-allocate trades, but Defendant states that because "[l]earning to use that software would have required training . . . at a time when Covid stay-at-home orders and concerns were prevalent" he did not use it.[73] Rather, Defendant alleges that he would record his pre-allocation decisions on written worksheets that he would keep in his office at ARC. Defendant alleges that he would use a timestamp machine on the sheets to mark the time when the trades he was making on the TDA platform were allocated.

The Court will briefly summarize the series of events that occurred after Defendant was first suspected of cherry-picking. On October 1, 2020, TDA

---

[71] *See* FED. R. EVID. 702.
[72] Doc. 49-1 at 11.
[73] *Id.*

notified ARC's Chief Compliance Officer ("CCO"), Sarah Pais, that Defendant was under investigation for trades made on the platform during the Relevant Period. Two weeks later, TDA terminated Defendant's access to its platform. Defendant remained employed at ARC until his termination in January 2021. According to Defendant, upon his termination, he was barred from accessing the ARC offices and therefore could not gain access to his pre-allocation worksheets. In his Motion, Defendant relies on deposition testimony from a former ARC office manager to assert that it is possible that his worksheets were moved or missing in the time after his termination.[74]

On February 15, 2022, the staff of the SEC served an investigative subpoena on Defendant requesting the production of documents by March 1, 2022.[75] Defendant did not produce any pre-allocation worksheets during this part of Plaintiff's investigative process or as a part of his submissions to the Wells Notice that Plaintiff sent to Defendant in June 2023.[76] Plaintiff asserts that it was not until Defendant's deposition of ARC's CCO on October 3, 2024 when Defendant produced fourteen pre-allocation worksheets for her consideration.[77] In his deposition and Motion, Defendant claims that he recovered the worksheets at his mother's house. He maintains that "the remaining original block sheets would likely have remained at his office" and that these show that Defendant did not engage in cherry-picking.[78]

As Dr. Canjels stated in his deposition, cherry-picking does not occur where trades are pre-allocated.[79] The Court finds that the production of even these fourteen time-stamped handwritten pre-allocation documents raise the

---

[74] *Id.* at 14-15.
[75] Doc. 53-12.
[76] Doc. 53-3 ¶¶9-10.
[77] Doc. 53 at 11.
[78] Doc. 49-1 at 16.
[79] Doc. 47-3, 202:23-25 –203:1-13.

question of whether Defendant did in fact pre-allocate his option trades. Plaintiff attacks the authenticity of the sheets, asserting that these are not originals, but rather copies, and that Defendant's failure to produce, let alone mention them sooner, is suspect. As such, whether Defendant pre-allocated his options trades during the Relevant Period is arguably *the* most material fact before the Court in this matter. The Court agrees that evaluating the authenticity of the documents and answering the question of whether cherry-picking occurred here is best left to the jury.[80]

Further, Dr. Canjels' report and testimony—which directly contradicts Defendant's assertion that there was no cherry-picking—has been deemed admissible by this Court. As such, the Court finds that Defendant has not met his burden of "pointing out to the [Court] that there is an absence of evidence to support the nonmoving party's case."[81] Consequently, Defendant's Motion for Summary Judgment must be denied.

### III.  Plaintiff's Motion in Limine to Exclude Export Reports and Opinions of Dr. David A. Lesmond

Plaintiff moves to exclude the reports and opinions of Defendant's expert witness, Dr. Lesmond, on both procedural and substantive grounds. Plaintiff argues that the second report Dr. Lesmond prepared was late and distinct from the first report he submitted, and that the first report Dr. Lesmond submitted was flawed by even his own admission. Defendant opposes, arguing that the differences between the first and second report are minimal and there is good reason for the delayed submission of the second report.

Pursuant to Federal Rule of Civil Procedure 16(b), this Court entered a Scheduling Order which provides that

---

[80] *See* FED. R. EVID. 1008.
[81] *Celotex Corp.*, 477 U.S. at 325.

Written reports of experts, as defined by the Federal Rules of Civil Procedure 26(a)(2)(B), who may be witnesses for Plaintiffs, shall be obtained and delivered to counsel for Defendant as soon as possible, but in no event later than NOVEMBER 11, 2024. This deadline shall also apply to all expert disclosures, as defined by the Federal Rules of Civil Procedure 26(a)(2)(C).

Written reports of experts, as defined by the Federal Rules of Civil Procedure 26(a)(2)(B), who may be witnesses for Defendants, shall be obtained and delivered to counsel for Plaintiff as soon as possible, but in no event later than DECEMBER 11, 2024. This deadline shall also apply to all expert disclosures, as defined by the Federal Rules of Civil Procedure 26(a)(2)(C)...

Written rebuttal reports of experts, as defined by the Federal Rules of Civil Procedure 26(a)(2)(B), who may be witnesses for Plaintiffs, shall be obtained and delivered to counsel for Defendant no later than DECEMBER 26, 2024. Plaintiff is cautioned that rebuttal reports should be strictly limited to opinions in response to the Defendant's expert reports.

The Court will not permit any witness, expert or fact, to testify or any exhibits to be used unless there has been compliance with thi Order as it pertains to the witness and/or exhibits, without an order to do so issued on motion for good cause shown.

Depositions for trial use shall be taken and all discovery shall be completed no later than JANUARY 10, 2025. This case does not involve extensive documentary evidence, depositions or other discovery. No special discovery limitations beyond those established in the Federal Rules, Local Rules of this Court, or the Plan are established.[82]

Pursuant to this Order, Dr. Lesmond timely submitted a written report to Plaintiff on December 11, 2024 (the "First Lesmond Report").[83]

---

[82] Doc. 22.
[83] Doc. 48-5.

On December 31, 2024, Plaintiff filed an *ex parte* Motion to Amend the Scheduling Order wherein they asked the Court to extend the deposition deadline of January 10, 2025 to February 10, 2025.[84] Plaintiff stated that its request was predicated on an unexpected family emergency that required its expert, Dr. Canjels, to leave the country, making him unavailable to be deposed or aid Plaintiff in its deposition of Dr. Lesmond before the January 10 deadline.[85] The Court granted Plaintiff's Motion, and extended the deposition deadline to February 10, 2025.[86]

In its instant Motion in Limine and an accompanying declaration by Plaintiff's counsel conducting the deposition, Plaintiff states that during its deposition with Dr. Lesmond on February 4, 2025, it became aware that Dr. Lesmond was in the process of preparing another report (the "Second Lesmond Report") in response to Dr. Canjels' rebuttal to the First Lesmond Report and his own changed opinions. Defendant's counsel emailed Plaintiff's counsel the evening of February 10, 2025 with the supplement that they had requested in Dr. Lesmond's deposition upon this revelation.[87] Plaintiff's counsel objected to this "new report" in a response email sent the next day.[88] Plaintiff followed up in another email, stating that a file it assumed contained the dataset contained no data when opened, and that when the program sent alongside the data was run, it did not "produce the same results shown in Dr. Lesmond's new report."[89] As such, Plaintiff requested the dataset and program used to produce the

---

[84] Doc. 43. In this Motion, Plaintiff also requested to change subsequent deadlines and the dates for the trial and pretrial conference.
[85] Doc. 43-1 at 3.
[86] Doc. 44. Deadlines for other motions, the pre-trial conference, and trial itself were extended accordingly.
[87] Doc. 48-9.
[88] Doc. 48-11.
[89] Doc. 48-12.

tables in the Second Lesmond Report.[90]   Defendant's counsel responded that the source files were lost "and that [Dr. Lesmond] was unable to recover them despite significant effort to do so."[91] Defendant's counsel reassured Plaintiff that, "Although the results are not exact, [Dr. Lesmond] submits that the substantive findings and results are the same and that they do not change the basic opinions underlying his original report."[92]

The Court will now consider the admissibility of both reports, starting with the Second Lesmond Report, as it appears that it is the one upon which both Defendant and Dr. Lesmond would rely on at trial.

### A. Second Lesmond Report

In its Motion in Limine, Plaintiff argues that the Second Lesmond Report is not admissible because it was not timely filed, and it is based on lost data. Defendant opposes, asserting that the Second Lesmond Report is a supplement of the First Lesmond Report, and even if it is not, it was filed before the close of discovery.

Under Federal Rule of Civil Procedure 26(a)(2), "[a] party must disclose 'all opinions the witness will express and the basis and reasons for them' as well as "the facts and data considered by the witness in forming their opinions."[93] "Expert reports under Rule 26 must be 'detailed and complete,' not 'sketchy and vague.'"[94] These disclosures "must be made 'at the times and in the sequence the court orders.'"[95] In the Fifth Circuit, "[t]he purpose of supplementary disclosures is just that—to supplement. Such disclosures are

---

[90] Doc. 48-12.

[91] Doc. 48-14.

[92] *Id.*

[93] Bertuccelli v. Universal City Studios LLC, No. 19-1304, 2021 WL 1521273 at *1 (E.D. La. Feb 26, 2021) (quoting Fed. R. Civ. P. 26(a)(2)(B)).

[94] Harmon v. Ga. Gulf Lake Charles, L.L.C., 476 F. App'x 31, 36 (5th Cir. 2012) (citing Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546, 571 (5th Cir. 1996)).

[95] *Id.* (quoting Fed. R. Civ. P. 26(a)(2)(D)).

not intended to provide an extension of the expert designation and report production deadline."[96] "The Fifth Circuit is also clear that supplements that include material additions to an opinion are not permitted."[97] "[I]f the information relied upon by an expert was available to the plaintiff at the time [that] the expert's initial report was prepared, a second report should not have been necessary, and [the] information contained in the second report should have been included in its expert's initial report."[98] "Courts have routinely rejected untimely 'supplemental' expert testimony where the opinions are based on information available prior to the missed deadline for [expert disclosures]."[99]

In his deposition, Dr. Lesmond admits to several differences between the First Lesmond Report and the Second Lesmond Report, referring to the latter as a "new report."[100] Dr. Lesmond admits that: he is using new data,[101] different prices,[102] an updated sample;[103] he is no longer eliminated outliers[104] and has included new variables.[105] Defendant asserts that the findings of the two reports before the Court do not differ despite these changes that Dr. Lesmond states were only made to facilitate comparison of the opposing

---

[96] Metro Ford Truck Sales, Inc. v. Ford Motor Co., 145 F.3d 320, 324 (5th Cir.1998).
[97] Stubblefield v. Suzuki Motor Corp., No. 3:15-CV-18-HTW-LRA, 2018 WL 11008929, at *1 (S.D. Miss. Mar. 22, 2018).
[98] Melton Properties, LLC v. Illinois Cent. R.R. Co., No. 4:18-CV-79, 2024 WL 3626691, at *9 (N.D. Miss. Aug. 1, 2024).
[99] Buxton v. Lil' Drug Store Prods., Inc., No. 2:02CV178KS-MTP, 2007 WL 2254492, at *5 (S.D. Miss. Aug. 1, 2007), aff'd, 294 F. App'x 92 (5th Cir. 2008) (citing *Sierra Club*, 73 F.3d at 571 (5th Cir. 1996)).
[100] Doc. 48-7 at 40.
[101] *Id.* at 9-10.
[102] *Id.* at 18.
[103] *Id.* at 21.
[104] *Id.* at 26.
[105] *Id.* at 30.

parties' experts.[106] Further, Defendant cannot provide Plaintiff with the that data he used to create the Second Lesmond Report because it is lost.[107]

The Court finds that the Second Lesmond Report varies significantly from the First Lesmond Report and is therefore an entirely new report, rather than a supplement. As such, because it was sent to Plaintiff's counsel on February 10, 2025—nearly two months after the Court's deadline for submission of Defendant's expert report of December 11, 2024—the Second Lesmond Report it was untimely.

Having concluded that the Second Lesmond Report does not comply with Rule 26 and that the First Lesmond Report does not pass muster under *Daubert*, the remaining question is the appropriate remedy. The presumptive sanction under Rule 37(c)(1) for the failure to disclose is exclusion.[108] Nonetheless, this Court has considerable discretion to fashion an appropriate remedy.[109]

"To decide if a failure to disclose is 'substantially justified or harmless,' [the Court must] weigh four factors: "(1) the explanation for the failure . . . ; (2) the importance of the testimony; (3) potential prejudice . . . ; and (4) the availability of a continuance."[110] "[T]he party who is alleged to have failed to comply with Rules 16 and 26 bears the burden to show that its actions were substantially justified or harmless."[111] Here, Defendant asserts that the failure

---

[106] Doc. 54 at 5-6.

[107] *See* Doc. 48-14.

[108] *See* FED. R. CIV. P. 37(c)(1); *see also* Honey-Love v. United States, 664 F. App'x 358, 362 (5th Cir. 2016) (per curiam) ("[U]nder Rule 37(c), the presumptive sanction for failing to disclose a testifying expert or supply a required expert report or summary disclosures is to exclude or limit the expert's testimony unless the failure was substantially justified or harmless.").

[109] *Sierra Club*, 73 F.3d at 571 (5th Cir. 1996).

[110] Indian Harbor Ins. Co. v. Covington Flooring Co., Inc., No. 24-30243, 2025 WL 416992, at *3 (5th Cir. Feb. 6, 2025).

[111] Avance v. Kerr-McGee Chem. LLC, No. 5:04CV209, 2006 WL 3484246, at *6 (E.D. Tex. Nov. 30, 2006).

to comply with the Court's Scheduling Order was the result of "Dr. Lesmond's limited availability due to his teaching schedule and . . . that the undersigned did not understand the extent of the revisions that Dr. Lesmond was undertaking. . ."[112] He also stresses that Dr. Lesmond's testimony is critical to Defendant's argument that he did not engage in cherry-picking and that to exclude such evidence would leave the court with nothing. Additionally, in his Response to Plaintiff's Motion, Defendant asks the Court to grant it a continuance to allow Plaintiff time to depose Dr. Lesmond about the Second Lemond Report.

The Court finds Defendant's reasons for delay to be insufficient. While Defendant's counsel might not have known about the extent of Dr. Lesmond's revisions, he was aware of the Scheduling Order, and should have had clear communications about what those dates meant for Dr. Lesmond and any reports he undertook. Both parties agree that the statistical analysis undertaken by the experts here is critical to this case, but "the importance [sic.] of such proposed testimony cannot singularly override the enforcement of local rules and scheduling orders."[113] Also, as Plaintiff points out, without access to the lost data undermining Dr. Lesmond's report and a corresponding continuance of other important dates articulated in the Scheduling Order, a continuance would likely be futile and would delay this matter substantially while also likely prejudicing Plaintiff in the time it would have after a deposition to prepare for an imminent trial.[114] As such, the Court will not grant a continuance.

---

[112] Doc. 54 at 10-11.
[113] Geiserman v. MacDonald, 893 F.2d 787, 792 (5th Cir. 1990).
[114] *See* Stewart v. Gruber, No. 23-30129, 2023 WL 8643633, at *6 (5th Cir. Dec. 14, 2023) (quoting *Geiserman*, 893 F.2d at 791).

### B. First Lesmond Report

Plaintiff argues in its Motion in Limine that the First Lesmond Report must be excluded because it applied an unreliable methodology to faulty and selective data, which Dr. Lesmond admitted at his deposition and were the target of correction in the Second Lesmond Report. In response, Defendant asserts that while Dr. Lesmond did concede certain shortcomings in his first report, there is good cause for allowing him to testify, particularly about the different conclusions he reached from Dr. Canjels by employing a multivariate, as opposed to univariate, approach to the data and incorporating Defendant's pre-allocations sheets and alleged prowess as an investor into his analysis.

"The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence."[115] Dr. Lesmond admitted that in the preparation of the First Lesmond Report, he did not rely on the TDA data, but rather data that was manipulated by actors he could not identify.[116] Throughout his deposition, Dr. Lesmond concedes to multiple errors in the methodology he used when testing this data in preparing the First Lesmond Report, prompting him to create the Second Lesmond Report.[117]

Further, in his opposition to Plaintiff's Motion, Defendant states that the First Lesmond Report "accurately captured the forest, but failed to fully account for the trees."[118] Further, Defendant conceded at oral argument that the First Lesmond Report did not pass muster. At one point, Dr. Lesmond testified that he found Defendant and his mother's accounts were treated favorably and doubled down when counsel sought to clarify this stance that

---

[115] McGhee v. Pride Offshore, Inc., No. CIV.A. 07-476, 2008 WL 2597925, at *2 (E.D. La. Apr. 3, 2008).
[116] Doc. 48-7 at 62.
[117] See Doc. 48-7.
[118] Doc. 54 at 9.

was at odds his conclusions.[119] As such, Defendant has not established by a preponderance of the evidence that Dr. Lesmond's testimony is sufficiently reliable.

"Even if the proponents meet their burden of establishing that an expert's testimony qualifies as [reliable], the court must still exclude the evidence if it does not 'fit' the matters at issue in the case."[120] Critically, in the First Lesmond Report, Dr. Lesmond removed outliers on the basis that they had the highest gains or losses, but that is exactly what is at issue in a determination of whether cherry-picking occurred.[121] As such, the Court finds that the his reasoning does not fit the facts of the case such that it will assist the trier of fact to understand the evidence before it.[122]

Taken together, these errors and resulting inconsistencies are confusing for the Court and will likely prove confusing and unhelpful to a jury. Accordingly, the Court finds that the First Lesmond Report is not admissible under Federal Rule of Evidence 702. Critically, "neither expert report provides the SEC with a detailed and complete disclosure of Dr. Lesmond's expert opinions."[123]

Defendant asked in his opposition and at oral argument whether it would be possible to have Dr. Lesmond testify untethered from his reports to offer opinions about Dr. Canjels' report and Defendant's trading prowess. Plaintiff opposes, arguing that it would be impossible for Dr. Lesmond to testify in some summary format without espousing opinions that he formulated in the preparation of his two inadmissible reports. The Court agrees with Plaintiff.

---

[119] Doc. 48-1 at 9 (citing Doc. 48-7, Lesmond Deposition at 93:18-94:18).

[120] Hall v. Baxter, 947 F.Supp. 1387, 1397 (D. Or. 1996) (citing *Daubert*, 509 U.S. at 591 (1993)).

[121] *See supra* p. 6.

[122] *See* Badeaux v. Eymard Bros. Towing Co., Inc., No. CV 19-13427, 2021 WL 4860300, at *2 (E.D. La. Oct. 19, 2021).

[123] Doc. 48-1 at 15.

Because of the questionable data on which Dr. Lesmond based his reports and formed his opinions about the case, it would not be appropriate for him to testify at all.[124]

Accordingly, the Court grants Defendant's motion to exclude expert testimony of Dr. Lesmond. The Court excludes both the First and Second Lesmond Reports in their entirety. Finding no admissible opinions to be offered by Dr. Lesmond, the Court orders that Dr. Lesmond may not testify at trial.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion in Limine to Exclude the Testimony and Opinions of Eugene P. Canjels, Ph.D. is **DENIED**; Plaintiff Security and Exchange Commission's Motion in Limine to Exclude Export Reports and Opinions of Dr. David A. Lesmond is **GRANTED**; and Defendant's Motion for Summary Judgment is **DENIED**.

New Orleans, Louisiana, on this 7th day of April 2025.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[124] *See* Allen v. Penn. Eng'g Corp.*, 102. F.3d 194, 199 (5th Cir.1996) ("[I]f the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion from that data is likewise unreliable.").